UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

L. W. MATTESON, INC.,

                              Plaintiff,

        v.                                                    **DECISION AND ORDER**
                                                              10-CV-168S

SEVENSON ENVIRONMENTAL
SERVICES, INC.,

                              Defendant.

## I. INTRODUCTION

In this action, Plaintiff L. W. Matteson, Inc. ("Matteson") brings suit against Defendant Sevenson Environmental Services, Inc. ("Sevenson") claiming that Defendant breached its contract with Plaintiff by failing to pay the agreed upon amount following Plaintiff's completion of dredging services on Defendant's behalf. Defendant counterclaims alleging Plaintiff negligently misrepresented its ability to perform the contract. Defendant also makes a cross-motion for sanctions claiming that Plaintiff destroyed evidence critical to its defense. Presently before this Court is Plaintiff's Motion for Summary Judgment on its breach of contract and prompt payment claims.[1] Also before this Court is Defendant's Cross-Motion for Sanctions.[2] Additionally, this Court has before it Plaintiff's Motion for

---

[1] In support of its Motion for Summary Judgment, Plaintiff filed a Statement of Facts, with Exhibits; a Memorandum of Law; and a Reply Memorandum to Defendant's Opposition. (Docket Nos. 30 - 40, 53 - 63.)
    In opposition to this motion, Defendant filed a Response to Plaintiff's Statement of Material Fact, with Exhibits; and a Memorandum of Law. (Docket Nos. 44 - 52.)

[2] In support of its Cross-Motion for Sanctions, Defendant filed a Memorandum of Law; and the Reply Affidavit of Sean J. MacKenzie, Esq., with attached Exhibits. (Docket Nos. 52, 66.)
    In opposition to this motion, Plaintiff filed a Memorandum of Law, with attached Exhibits. (Docket No. 64.)

Status Conference and Suggestions in Support.[3]  For the reasons discussed below,

Plaintiff's Motion for Summary Judgment is granted in part and denied in part, Defendant's

Cross-Motion for Sanctions is denied, and Plaintiff's Motion for Status Conference and

Suggestions in Support is denied as moot.


## II.  BACKGROUND

A.      **Facts**

Plaintiff Matteson is an Iowa corporation with its principal place of business in

Burlington, Iowa.  (Complaint ("Comp."), Docket No. 1, ¶ 1.)  Matteson is in the business

of dredging materials from waterways and major bodies of water throughout the United

States, in the role of general contractor, subcontractor, and lessor.  (Plaintiff L. W.

Matteson's Reply to Defendant's Response to the Statement of Material Facts in Support

of Matteson's Motion for Summary Judgment ("Statement"), Docket No. 54, ¶ 1.)

Defendant Sevenson is a New York corporation with its principal place of business in

Niagara Falls, New York.  Sevenson is in the business of environmental remediation

projects and acts as a general contractor.  (Id. at ¶ 2; Comp. ¶ 2.)

The TVA is a corporate agency and instrumentality of the United States engaged

in electrical power generation.  (Statement ¶ 4.)  The TVA had been storing fly ash waste

in a storage cell adjacent to the Emory River.  (Id. ¶¶ 5, 6.)  This storage cell failed on

December 22, 2008, releasing fly ash into the Emory River, prompting the TVA to issue a

---

[3]Plaintiff moves this Court to set a new trial date because of concerns regarding the age of one of its primary expert and fact witnesses, Lawrence Matteson, Sr., founder and majority owner of L. W. Matteson, Inc.  Because this Decision and Order resolves Plaintiff's Motion for Summary Judgment and returns this matter to Judge Schroeder for further consideration, this Court does not reach Plaintiff's request to set a trial date.

Request for Proposal for dredging the Emory River of fly ash.  (Id. ¶ 7, 9.)

Sevenson submitted a proposal which included the use of two dredging vessels, as well as a third vessel as needed, to meet the TVA's specifications that an average minimum of 9,000 cubic yards be dredged per day, for a total of 1.5 million cubic yards over the course of the project.  (Id. ¶¶ 10, 11, 12.)  Sevenson and the TVA entered into a contract on July 15, 2009 for dredging operations in the Emory River, with an effective date of July 1, 2009.  (Id. ¶ 16.)

Prior to entering the contract with the TVA, Sevenson executed a Purchase Order ("PO") with Matteson, in which Matteson agreed to provide a dredging vessel, equipment, and personnel, and perform dredging work as directed by Sevenson at a per hour unit price.  (Id. ¶¶ 20, 23.)   The PO provided that Matteson would provide good and merchantable equipment, and would repair and replace equipment that Sevenson found faulty or defective.  (Id. ¶ 23.)  The PO also included a series of rental rates that set a payment schedule dictating how Matteson would be paid.  (Id. ¶ 24.)  Pursuant to this schedule, Matteson would be paid 100% "pay time" ($2,100) per hour its dredge was in operation with the cutterhead turning and the main pump moving material through the pipeline.  (Id.)  Matteson would be compensated 70% ($1,470) per hour while it was moving anchors, cleaning swing lines, or other similar work.  (Id.)  Finally, Matteson would only receive 40% ($840) per hour the dredge was down due to inclement weather, and 0% for any time relating to operating repairs and mechanical breakdowns in excess of 2 hours per event.  (Id.)  A similar percentage breakdown was calculated for use of a booster pump.  (Id. ¶ 26.)  The PO estimated 2000 hours of dredging at a 100% payment rate, 500 hours at a 70% rate, and 200 hours at a 40% rate.  (Id.)  However, the PO also stated that

3

Matteson would be paid a unit price regardless of whether the final quantities were more or less than the estimated quantities. (Id.) Additionally, Matteson was to receive lump payments of $625,000 and $310,000 for mobilization and demobilization of the drill, respectively. (Id. ¶ 25.)

Sevenson retained the right to terminate the contract for any reason and did so on February 1, 2010 after dredging operations were completed. (Id. ¶ 35.) Matteson calculated that the total hours of operation under the 100%, 70%, and 40% pay categories added up to a final cost of $5,173,273.50. (Id. ¶ 44.) This included 1,709.96 hours at 100% pay time, 776.01 hours at 70% pay time, and 85.42 hours at 40% pay time. (Id.) Sevenson reevaluated Matteson's calculations and paid Matteson only $2,931,587.11. (Id. ¶¶ 44, 47.) Matteson brings this action to recover the difference, plus interest. (Comp. ¶ 53.) Sevenson counterclaims alleging that Matteson misrepresented its ability to dredge 1.5 million cubic yards of fly ash at an average daily rate of 12,000 - 20,000 in situ cubic yards. (Answer with Counterclaim, Docket No. 8, ¶ 15.) Sevenson also claims Matteson was responsible for the destruction of evidence crucial to Sevenson's defense. (Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Cross-Motion for Sanctions ("Def.'s Opp'n), Docket No. 52, 14.)

## B.    Procedural History

Plaintiff commenced this action on March 2, 2010 by filing a complaint in the United States District Court for the Western District of New York. On April 5, 2010, Sevenson filed an Answer and Counterclaim. Matteson responded with its Reply on April 26, 2010 and this Court referred non-dispositive pre-trial matters to the Honorable H. Kenneth

Schroeder, Jr., United States Magistrate Judge.   After a series of amended case management orders, discovery was set to close by June 1, 2011.  Immediately prior to the close of discovery, Sevenson moved Judge Schroeder to grant an extension of time to complete discovery, as well as a motion to amend/correct its Answer to include a re-calculation of damages and clarification of its negligent misrepresentation counterclaim. The motions were fully briefed.  Before Judge Schroeder could issue a decision resolving Sevenson's motions, Matteson filed its Motion for Summary Judgment.  This Court stayed Judge Schroeder's amended case management order of March 4, 2011 pending resolution of Plaintiff's motion.   Sevenson filed its Opposition to Matteson's motion on August 12, 2011, including a Cross-Motion for Sanctions.   Matteson filed a reply to Sevenson's Opposition on September 2, 2011, and a Response to Sevenson's cross-motion on September 6, 2011.  Sevenson filed an Affidavit in reply on September 16, 2011.  Most recently, on October 27, 2011 Matteson filed a Motion for Status Conference and Suggestions in Support, requesting that this Court set a trial date.

## III.  DISCUSSION AND ANALYSIS

### A.    Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A "genuine issue" exists "if the evidence is such that a reasonable jury could

return a verdict for the non-moving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  A fact is "material" if it "might affect the outcome of the suit under governing law." <u>Id.</u>

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." <u>Addickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970).  "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." <u>Bryant v. Maffucci</u>, 923 F.2d 979, 982 (2d Cir. 1991).  The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 249.

**B.    Plaintiff's Motion for Summary Judgment**

Matteson's dispositive motion raises three primary issues: (1) whether Sevenson breached its contract with Matteson; (2) whether Sevenson's affirmative defenses preclude summary judgment in Matteson's favor; and (3) whether Matteson is entitled to summary judgment on Sevenson's counterclaim.  These issues are discussed below.

**1.    The Existence of Disputed Issues of Material Fact Precludes Summary Judgment in Plaintiff's Favor on its Breach of Contract Claim**

Matteson argues that it is entitled to summary judgment because the PO requires payment according to the number of hours Matteson's equipment is used.  Matteson asserts that on top of the $2,931,587.11 Sevenson previously paid, Matteson is entitled to an additional $3,926,760.92, plus pre-judgment interest, for its work.  Sevenson disputes the accuracy of Matteson's calculations and alleges that Matteson improperly charged a

100% payment rate anytime the dredge pumps were running, instead of reducing the payment rate whenever the dredge pumps were only pumping water.

Under New York law, a plaintiff alleging a breach of contract must establish (1) the existence of a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) resulting damages. Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir. 1994).[4]   The parties do not dispute that the PO constitutes a contract between them.   The second element is the source of Sevenson's affirmative defenses, and is discussed later.   Therefore the principal issue to resolve is whether Sevenson underpaid Matteson, or whether Matteson inflated the payment rate it was due.

The parties' agreement, detailed in the PO, calls for a 100% payment rate of $2,100 for every hour the dredge pumps were active and pumping material.  (Statement ¶ 24.) "Material" is defined as anything over the density of water.  (Def.'s Opp'n 4.)  Because the density of water is 1.0 grams per cubic centimeter, anything over that number would constitute material.  (Id.)  Fly ash, the specific material Matteson was dredging for, ranged from 1.0001 to 1.4 grams per cubic centimeter.  (Id.)  The parties agree that whenever the dredges were pumping water, or 1.0 grams per cubic centimeter, and not material, that a reduced payment rate would be applied.   (Plaintiff L. W. Matteson, Inc.'s Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment ("Pl.'s Reply"), Docket No. 53, 3-4.)

The parties dispute how the number of 100% payment rate hours should be determined.  Matteson argues that the hours should be measured according to the dredge

---

[4]Neither party disputes the applicability of New York law.  Furthermore, the disputed PO provides that it is to be governed by, and interpreted under, New York law.  (Statement ¶ 31.)

logs.  Sevenson argues that the dredge logs are inaccurate, and that the proper record is determined by a computer software program installed on Matteson's dredge vessel called WinOPS.  (Def.'s Opp'n 7.)

The dredge logs were kept by Matteson's dredge operators, or levermen, who operated the dredge pumps and recorded when those pumps were started and stopped, as well as the density of the material being pumped.  (Pl.'s Ex. 20.)  In addition, Sevenson had personnel on Matteson's vessel full-time to observe the effluent being discharged by the dredging operation.  (Pl.'s Ex. 19.)  The logs were submitted to Sevenson's Project Manager, Joseph Burke, who allegedly compared Matteson's pay applications with Sevenson's own records and resolved any discrepancies.  (Plaintiff L. W. Matteson, Inc.'s Memorandum in Support of Motion for Summary Judgment, Docket No. 40, 3-4.)  Using these records, Sevenson created a spreadsheet, identifying the number of hours dredged by Matteson.  (Statement ¶ 28.)  Further, Matteson contends that charging on the basis of the dredge logs constitutes the industry standard.  (Pl.'s Reply 3.)

Sevenson disputes the accuracy of the dredge logs on a number of grounds.[5] Sevenson's principal challenge is that the dredge logs only track when the pumps are active and do not track whether pumps are pumping water or material.  As a result, the

---

[5]Matteson accuses Sevenson of introducing various witness affidavits that conflict with the respective witnesses' deposition testimony and that these affidavits were introduced after the close of discovery.  "To the extent that [a witness's] earlier deposition testimony is at odds with his declaration, we follow the rule that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."  Ramos v. Baldor Specialty Foods, Inc., 10 Civ. 6271(RMB), 2011 WL 2565330, at *7 n.6 (S.D.N.Y. June 16, 2011) (quoting Raskin v. Wyatt Co., 125 F.3d 55, 63 (2d Cir. 1995)).  This Court notes, however, that discovery in this case had not yet closed at the time Matteson filed its Motion for Summary Judgment.  Rather, Judge Schroeder had before him Sevenson's Motion for Extension of Time to Complete Discovery and Sevenson's Motion to Amend/Correct Answer.  Consequently, although this Court will look to whether a witness's deposition testimony conflicts with his affidavit, it will not view Sevenson's actions as abusive.

dredge logs cannot provide an accurate measurement of when Matteson was entitled to a lesser payment rate.

However, Sevenson's argument ignores that the dredge logs do, in fact, show when Matteson was pumping water and charging the agreed upon 70% payment rate.  (See, e.g., Pl.'s Ex. 17b.)  Although Sevenson alleges that the dredge operator's shift log only shows when the pump was stopped and started, the dredge logs actually show, under a column entitled "Lost Time," the specific payment rate, variously listing 70%, 100%, and 0%.  (Id.)  Those entries recording 70% payment list multiple reasons for the reduced payment rate, including whenever water was being pumped through the pipeline.  (Id.)

The affidavits Sevenson submits do little to counter this fact.  For example, Sevenson argues that Burke's affidavit demonstrates that neither he nor anyone else kept track of when Matteson was pumping material.  Yet Burke's deposition shows that he did go over Matteson's numbers, including downtime and standby time, and that he conferred with Mahlon Vance Mangum, Matteson's project superintendent, to ensure that the numbers were in agreement.

> Q: [I]t seemed to me that there was a first part where you would match up from project records the actual hours that were being claimed on the Matteson pay application?
> A: Correct.
> Q: Okay.  And then you would satisfy yourself that those were acceptable to you?
> A: Yes.
> Q: Okay.  And then you would go through the second process of then adjusting the invoice?
> A: Correct.

(Pl.'s Ex. 12.)

Sevenson also selectively quotes from the deposition of L.W. Matteson, Jr.,

Matteson's vice-president. Sevenson quotes the witness as saying that "[i]f the pump is turning, that's paytime, one hundred percent pay time," as evidence that Matteson only kept track of when the pump was on and off. (Def.'s Opp'n 5.) Sevenson neglects to include the following sentence, which states "[w]hen the clutch is out and you are moving anchors or cleaning debris, it's at a lesser rate." (Def.'s Ex. 9.) Sevenson continues to cherry-pick later parts of the deposition, quoting "[i]f there is water coming out of the end of the pipe, the clutch is engaged . . . . [i]f there's not, the clutch wouldn't be engaged . . . . [t]hat's the normal situation, yes." (Def.'s Ex. 9.) But Sevenson ignores the intervening testimony that rental agreements would typically also involve the parties agreeing on a daily basis what the run time was, including that in this contract Sevenson had individuals watching what was coming out of the pipe. (Def.'s Ex. 9.)

Sevenson has also submitted the affidavit of M.V. Mangum, who was Matteson's superintendent on the project, and responsible for preparing and submitting daily production reports to Sevenson. (Def.'s Ex. 6.) Sevenson argues that Mangum was never instructed to exclude from the levermen's logs or daily reports the time that only water was being pumped. Sevenson submits select pages from Mangum's deposition in support of this contention, but fails to include that testimony showing that Mangum would be contacted from the shoreline regarding what type of material the pump was releasing. (See Def.'s Ex. 14; Pl.'s Ex. 20.) Specifically, Mangum testified that:

> Q:    And did you find at times that it was just pumping water?
> A:    We would get calls from the rim ditch saying it was just – you know, it was like – they had categorizes [sic], dark gray, gray, light gray and clear. They would call us and let us know what was coming out of the pipes."

(Pl.'s Ex. 20.) Mangum went on to testify that he "had reliable reports and the leverman

there to hopefully tell [him] the truth."  This was corroborated by Sevenson's President, Michael A. Elia, who testified that Sevenson's personnel observed Matteson's dredging operations.  (Pl.'s Ex. 19.)  Mangum's later affidavit testifies that Matteson failed to inform its levermen that the dredge logs should only include time spent pumping material.  (Def.'s Ex. 6.)  To the extent this affidavit conflicts with Mangum's earlier deposition testimony that the levermen were informed when only water was being pumped and that these reports were reliable, Mangum's affidavit is deemed inconsistent and will not be considered. Golden v. Merrill Lynch & Co., No. 06 Civ. 2970(RWS), 2007 WL 4299443, at *9 (S.D.N.Y. Dec. 6, 2007) ("Courts in this Circuit have rejected such attempts to rely on declarations that contradict the witness's prior deposition testimony and have granted summary judgment even where the purported new evidence would otherwise create a triable issue of fact." (citing Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001)).  This Court further notes that, as discussed above, the dredge logs did show when only water was being pumped.

Other affidavits submitted by Sevenson are no more availing.  Richard Bradley, one of Matteson's engineers, now working for Sevenson, stated that levermen wrote in the dredge logs when the dredge pump was started and stopped, which "included the time that the dredge was pumping water in order to float lines and sink lines."  (Def.'s Ex. 2.)  But this corresponds exactly to what the dredge logs show, namely that the levermen would record, under the column labeled "Reasons," why payment at a reduced rate was appropriate, including during those times when they would float and sink lines.

Nevertheless, summary judgment cannot be granted in Matteson's favor because the record contains enough evidence to challenge the accuracy of the dredge logs.  For

11

example, Superintendent Mangum, during his deposition, described several problems with the nighttime levermen.  "The nighttime people, they would write down stuff and I didn't ever know what half of it meant.  I mean, I don't know whether they was [sic] just writing down stuff to be writing it down or what . . . ." (Pl.'s Ex. 20.)  Mangum further testified that the density meter was inoperable at times and that levermen would not always record gauge readings.  (Id.)  "They a whole lot of times just didn't fill it out.  You know, whether it was working correctly or not, at times it was, at times it wasn't.  I would have the levermen argue back and forth about it."  (Id.)  Other testimony confirms that the dredge reports were not entirely accurate.  The affidavit of Timothy M. Donegan, a licensed engineer previously with Matteson, shows that Matteson's density gauge may not have been working properly.  (Def.'s Ex. 5; Pl.'s Ex. 25.)  This was corroborated by the affidavit of Timothy J. Harrington, a licensed engineer with a company called Hard Hat Services that was retained by Sevenson to analyze the dredge production of Matteson.  (Def.'s Ex. 4.) Harrington's analysis revealed that the density meter would read 1.01 or 1.02 even when pumping only water.  (Id.)

Further, although Matteson claims it proceeded in a manner consistent with the industry's standard, Matteson has not shown that the parties intended this standard to bind their agreement, especially since the PO stipulated that Matteson would act "in strict compliance" with the principal contract between the TVA and Sevenson.  (Pl.'s Ex. 11.) Indeed, the PO only refers to Matteson performing the dredging operations in "a good and workmanlike manner."  (Id.)  This Court finds instructive that "courts that have interpreted contracts that require undefined 'commercially reasonable' conduct have not read industry standards into that term without further evaluation of the parties' circumstances and the

12

consequences of compliance with these standards." Microboard Processing, Inc. v. Creston Elec., Inc., No. 3:09cv708 (JBA), 2011 WL 1213177, at *2 (D. Conn. Mar. 29, 2011). Here, the only reference to the relevance of industry standards is a brief mention by Matteson's Vice-President of Operations Jon Nieman that billing based on the dredge log is the industry standard. (Pl.'s Ex. 25.) Without more, this is not enough to grant summary judgment in Matteson's favor. Additionally, even if this Court were to find the industry standard relevant, Sevenson has presented sufficient evidence of errors in the dredge logs to raise a question of whether Matteson complied with its purported standard. Consequently, "[t]he Court believes that it is best left to the jury to decide whether any industry standards or practices have been violated." Nygren v. Greater N.Y. Mut. Ins. Co., No. 3:07CV00462(DJS), 2009 WL 807470, at *5 (D. Conn. Mar. 27, 2009); see also Fleetwood Agency, Inc. v. Berde Elec. Corp., 925 N.Y.S.2d 576, 578 (N.Y. App. Div. 2011) (holding that summary judgment should have been denied where affidavits created triable issues of fact as to whether pricing of services was in compliance with industry standards); Mary Imogene Bassett Hosp. v. Cannon Design, Inc., 923 N.Y.S.2d 751, 754 (N.Y. App. Div. 2011) ("Even if defendant complied with industry standards . . . defendant could still be held liable for a breach of contract.").

The Court also notes that Sevenson has argued in favor of an alternative means of measuring Matteson's hours of operation. (Def.'s Opp'n 8.) WinOPS is a software program installed aboard dredging vessels, including Matteson's, that monitors the positioning of a dredge, as well as the density of material being pumped. (Pl.'s Ex. 25.) Data from that program reflects that between August 25, 2009 and September 1, 2009 there were significant discrepancies between the total hours WinOPS recorded the pumps

13

processing material of a density in excess of 1.0 grams per cubic centimeter and the total hours that Matteson billed at 100%. (Def.'s Ex. 5.) Specifically, between August 25, 2009 and September 1, 2009, WinOPS recorded a density in excess of 1.0 for a total of 79.3 hours. (Id.) By contrast, Matteson billed Sevenson at a 100% payment rate for 114.25 hours. (Id.) Considering the total time the pump was operating, reveals that Matteson was only pumping material having a density greater than 1.0 for 53% of the time. (Id.) Unfortunately, for reasons discussed later, WinOPS data is available for only this eight day period.

Unsurprisingly, Matteson strongly contests the data's significance. Matteson argues that WinOPS is never used to calculate the amount of material dredged, or the number of hours a dredge was pumping, and reiterates that the industry standard is to abide by the dredge logs. (Pl.'s Ex. 25.) Of greater importance, is Matteson's assertion that WinOPS only records density data to a single decimal point. This means that a dredge pump could be processing material at a density of 1.0001, while WinOPS would record a density of 1.0, the density of water. (See Pl.'s Ex. 25.) WinOPS data in the record does indeed reflect that density is measured only to a single decimal. (See, e.g., Def.'s Ex. 5b.) Further, the density of fly ash in water ranges anywhere from 1.0001 to 1.3. (Pl.'s Ex. 25.) There is, in short, substantial doubt as to whether WinOPS can accurately monitor the number of hours a dredger pumps material. Nevertheless, resolving such doubts is a task better left to the trier of fact at trial, and not this Court on motion. This is especially so given the questionable accuracy of Matteson's dredge logs.

Accordingly, Matteson's Motion for Summary Judgment on its breach of contract

claim will be denied.[6]

## 2. The Lack of Response to Plaintiff's Arguments Results in the Abandonment of Defendant's Affirmative Defenses

Sevenson presents two affirmative defenses in its Answer.  The first is that Matteson breached the contract by failing to provide a sufficient number of skilled employees and equipment in good working order.  The second is that Matteson warranted that it would be able to excavate an average rate of 12,000 in situ cubic yards per day of fly ash.  In its supporting memorandum, Matteson argues that neither of these defenses is sufficient to preclude summary judgment.  Matteson points to the PO which does not contain any production requirements, and only specifies payment by hours of operation.  Similarly, the PO does not specify staff levels.  The PO also contains a merger clause stating that "[t]his agreement is the sole and entire agreement between the parties and supersedes all prior communications, proposals, offers and agreements, whether written or oral," which Matteson argues precludes Sevenson's affirmative defenses.

"Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."  Dunkin' Donuts Franchised Rests. LLC v. Tim & Tab Donuts, Inc., No. 07-CV-3662 (KAM)(MDG), 2009 WL 2997382, at *9 (E.D.N.Y. Sep. 15, 2009) (quoting Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)).

Upon review of Sevenson's responding memorandum, it is clear that Sevenson

---

[6]Matteson also moves for summary judgment on its New York Prompt Payment Law claim. Sevenson contends, and Matteson does not dispute, that resolution of this claim depends on the outcome of Matteson's breach of contract claim.  Therefore, because this Court denies summary judgment in favor of Matteson on its breach of contract claim, the Court will also deny Matteson's motion as to its prompt payment claim.

disputes Matteson's motion for summary judgment as to Sevenson's counterclaim, but makes no arguments responding to Matteson's arguments against its affirmative defenses. Specifically, Sevenson has no response to the fact that the PO does not contain minimum staffing or production levels, that the merger clause precludes warranty defenses, that the agreement already provided for pay exceptions for faulty equipment, and that Sevenson failed to exercise its right to terminate Matteson until the dredging operations were completed.   Although there may be some factual cross-over between Sevenson's affirmative defenses and its counterclaim, Sevenson has chosen to address these, if at all, within the context of its counterclaim.   "As a result of defendants' failure to oppose plaintiff's motion as to their defenses . . . the court finds that the defendants abandoned their affirmative defenses. . . . [and] grants plaintiffs' motion for summary judgment as to the affirmative defenses . . . ."  Id. (citing Wecare Holdings, LLC v. Bedminster Int'l Ltd., 08-cv-6213, 2009 U.S. Dist. Lexis 20080, at *28 (W.D.N.Y. Mar. 9, 2009)).

**3.     The Failure to Show Reasonable Reliance Warrants Granting Plaintiff's Motion for Summary Judgment on Defendant's Counterclaim for Negligent Misrepresentation**

In its Answer, Sevenson asserts a counterclaim for negligent misrepresentation.[7] Sevenson alleges that Matteson misrepresented that its dredging equipment was capable of removing fly ash from Emory River at an average daily rate of 12,000 - 20,000 in situ cubic yards.   Sevenson further alleges that it relied upon these representations in submitting its proposal to the TVA, in which it identified Matteson as a dredging

_____

[7]This Court acknowledges that, as a result of its order staying the most recent case management order, Judge Schroeder has not had the opportunity to rule on Sevenson's Motion to Amend/Correct Answer.  Because this Court must make all inferences in favor of the non-moving party, here Sevenson, this Court will assume, for purposes of resolving Matteson's motion, that Sevenson's Answer has been amended.

subcontractor capable of removing ash at a daily rate of 12,500 in situ cubic yards.  (Motion to Amend/Correct Answer, Docket No. 21, Ex. E, ¶ 20.)   Having relied on Matteson's alleged misrepresentations, Sevenson claims that it then incurred damages.  Specifically, because Matteson failed to complete its contractual duties, Sevenson was unable to complete its work for the TVA by December 31, 2009.  (Id. ¶ 28.)  This meant not only that Sevenson missed out on an early performance bonus of $71,429 per day, capped at $2,000,000, but also that Sevenson incurred the cost of maintaining dredging operations until February 1, 2010 in the amount of $3,813,445.  (Id. ¶¶ 27, 28, 29.)  Matteson responds that Sevenson cannot establish the requisite reliance and that any statements Matteson made were, in any case, non-actionable future statements.

"Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.  In re Artrade Fin. Techs. Ltd., No. 02-16212 (ALG), 2007 WL 433358, at *5 (Bankr. S.D.N.Y. Feb. 5, 2007) (quoting Hydro Investors, Inc. v. Trafalgar Power, 227 F.3d 8, 20 (2d Cir. 2000)).

Matteson argues that Sevenson cannot establish reasonable reliance on Matteson's alleged misrepresentations.  Even where there is a duty to disclose and a special relationship between the parties, it is not necessarily the case that one party reasonably relied on the misrepresentations or omissions of another.  PPI Enters. (U.S.), Inc. v. Del

Monte Foods Co., No. 99 Civ. 3794(BSJ), 2003 WL 22118977 (S.D.N.Y. Sep. 11, 2003).

Here, there is conflicting testimony as to whether Sevenson relied on Matteson's representations regarding its ability to dredge 12,000 in situ cubic yards per day. Sevenson argues that Matteson quoted it this figure, and that Sevenson relied on this quote in making its June 15, 2009 bid, citing to excerpts of its president's deposition. (Def.'s Ex. 8.)   However, that excerpt does not mention any date.   Furthermore, Sevenson's reliance on a detailed cost summary by Matteson is misplaced because this was an internal document, that was never provided to Sevenson until discovery.  (Def.'s Ex. 13.)

Mike Crystal, one of Sevenson's vice-presidents, does recall asking Jon Nieman prior to the proposal whether Matteson had a dredge available that could do work in the 12,000 yard volume range, to which Nieman responded in the affirmative.  (Affidavit of Sean J. MacKenzie, Docket No. 70, Ex. B.)  But aside from this conversation, of which Crystal remembers no further details, Crystal's deposition reveals that Matteson stated that it would have "no problem doing 12,000" only after Sevenson had already submitted its bid.

In any case, these testimonies are ultimately unavailing because the only actual quote Matteson made to Sevenson, from June 12, 2009, does not state any production requirements.  Instead, it clearly states that "Pay hour quantities are estimated quantities." (Def.'s Ex. 15.)  These estimates are backed up by the fact that the PO itself only lists estimated hours.  Additionally, the PO contains a merger clause stating that the PO is the "sole and entire agreement between the parties and supersedes all prior communications, proposals, offers and agreements, whether written or oral." (Statement ¶ 31.) The PO also specifies that Matteson would be paid at a unit price, "regardless of whether the final

18

quantities are more or less than the estimated quantities stated herein or in the Principal Contract." (Pl.'s Ex. 11.)  These circumstances preclude Sevenson from establishing reasonable reliance because any representations would have been replaced by the parties' agreement which contained only an estimate of the hours, and did not bind Matteson to any particular production number.  See Harsco Corp. v. Segui, 91 F.3d 337, 342-43 (2d Cir. 1996) (affirming district court's holding that plaintiff failed to establish reasonable reliance where contract contained merger clause and disclaimed all representations not in the agreement).

Sevenson's claim that it reasonably relied on Matteson's assertions is further undermined because the record primarily references conversations regarding Matteson's production capabilities occurring after Sevenson had submitted its bid, and before execution of the PO.  (Statement ¶ 38.)  These meetings also reflect that Matteson was making no guarantees regarding its ability to process 12,000 cubic yards. (Pl.'s Ex. 13.)

Accordingly, this Court concludes that Sevenson could not have reasonably relied on any assertions Matteson allegedly made.  Both parties are experienced business entities that knowingly entered into a contract that expressly provided that it was the sole agreement between them. (See Pl.'s Ex. 7.)  That contract provided for an hour-based payment schedule.  It did not contain a daily production average.  Similarly, the only clear quote Matteson provided prior to Sevenson's bid submission also does not include a daily production average.  Sevenson cannot now claim that a production schedule should be read into the parties' agreement.  "[W]here, as here, an express provision in the written contract contradicts the claimed oral representations in a meaningful fashion . . . . the conflict between the provisions of the written contract and the oral representations negates

19

the claim of reliance upon the latter." Bango v. Naughton, 584 N.Y.S.2d 942, 944, (N.Y. App. Div. 1992).  Matteson's Motion for Summary Judgment on Sevenson's counterclaim will be granted.[8]

## C.    Defendant's Cross-Motion for Sanctions

Sevenson asserts it is entitled to sanctions for Matteson's failure to retain WinOPS data.  Sevenson argues that the parties' relationship provided Matteson with reasonable notice of the potential for litigation as early as September 2009, as evidenced by Sevenson's Notice of Potential Default/Termination to Matteson.   (Def.'s Ex. 22.) Sevenson further argues that, knowing that litigation was reasonably foreseeable, Matteson failed to preserve the WinOPS data which allegedly included the only accurate record of Matteson's dredging operations.  Matteson responds that it provided Sevenson with the WinOPS data throughout their relationship and that Sevenson expressed interest in this data only after Matteson filed its Motion for Summary Judgment.

A party seeking sanctions based on spoilation of evidence must establish that "(1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the records were destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."  Liberman v. FedEx Ground Package Sys., Inc., No. 09 CV 2423(RML), 2011 WL 145474, at *2 (E.D.N.Y. Jan. 18, 2011) (citing Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 430 (S.D.N.Y. 2004)).

---

[8]Because this Court finds that Sevenson could not have reasonably relied on Matteson's representations, it does not reach Matteson's other argument that any misrepresentations were promises of future output, and hence non-actionable under Hydro Investors, Inc.  See Stokes v. Lusker, 425 Fed. Appx. 18, 21 (2d Cir. 2011) ( "An alleged misrepresentations cannot be 'promissory or relating to future events that might never come to fruition.'" (quoting Hydro Investors, Inc., 227 F.3d at 20)).

Of these, only the third element is clearly met.  "[T]he party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that 'the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction." Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 109 (2d Cir. 2002) (quoting Kronisch, 150 F.3d at 127).  Here the availability of several days' worth of WinOPS data is sufficient to show that the missing WinOPS data would likely have yielded similar information.  However, in consideration of the remaining elements, this Court concludes that Sevenson's cross-claim should be denied.

A party seeking sanctions for destroyed evidence must establish that "the party having control over the evidence . . . had an obligation to preserve it at the time it was destroyed." Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998).  The obligation typically arises when a party is put on notice that the evidence is relevant to litigation, which may be after or before suit is filed, depending on the circumstances. Liberman, 2011 WL 145474, at *3.  Here, Sevenson alleges such an obligation attached as of August 25, 2009 and September 4, 2000 when Sevenson made Matteson aware that it was not satisfied with Matteson's performance.  (Def.'s Exs. 18, 22.)  However, although these letters express Sevenson's dissatisfaction, they do not contest the manner in which Matteson was tracking its hours of operation.  The letters refer to holes in the hull of Matteson's vessel and Matteson's supply of spare parts, but does not reference the manner in which Matteson recorded the number of hours it pumped material, or the accuracy of that process.  This does not create an obligation to save records from a software program that kept track of a dredging vessel's positioning.

Moreover, sanctions will not be imposed unless the party responsible had a

21

sufficiently culpable state of mind.  In re WRT Energy Sec. Litig., 246 F.R.D. 185, 195

(S.D.N.Y. 2007).  A culpable state of mind includes "knowingly, even if without intent to

breach a duty to preserve [the evidence], or *negligently*."  Liberman, 2011 WL 145474, at

*4 (quoting Residential Funding Corp., 306 F.3d at 108) (emphasis and alterations in

original).  Here, there is no evidence that Matteson intended to destroy the data.  Rather,

it appears that the data was lost because the computer on which it was stored does not

save the information, and deletes it when it begins a new job.  (Pl.'s Ex. A.)  Additionally,

it is undisputed that Matteson supplied the WinOPS data upon request by Timothy

Donegan on September 4, 2009 via email.  (Def.'s Ex. 5.)  Matteson has also submitted

testimony that it submitted further WinOPS data on a daily basis.  (See Pl.'s Exs. A, B.)

Although Sevenson has presented contrary evidence, (Def.'s Ex. 3), this Court is not

persuaded that Sevenson has met its burden of establishing that Matteson acted

negligently.  See Gutierrez-Bonilla v. Target Corp., No. CV 08-3985(JS)(AKT), 2009 WL

5062116, at *5 (E.D.N.Y. Dec. 16, 2009) (finding defendant had no obligation to preserve

footage where recycling tapes was part of normal business practice).

Therefore, Sevenson's Cross-Motion will be denied.[9]

_____

[9]Even were Sevenson's motion granted, this Court would not impose the penalties Sevenson
seeks.  Sanctions should be designed to "(1) deter parties from engaging in spoilation; (2) place the risk of
an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party
to the same position he would have been in absent the wrongful destruction of evidence by the opposing
party.'"  Occhino v. Citigroup Inc., No. CV-03-5259, 2005 WL 2076588, at *11 (E.D.N.Y. Aug. 26, 2005)
(quoting Kronisch, 150 F.3d at 126).  Sevenson asks this Court to prohibit Matteson from offering
evidence concerning when the dredge pumps were engaged, as well as from contesting the WinOPS
data's accuracy.  However, this would effectively render a verdict in Sevenson's favor.  A more appropriate
sanction would permit an inference that the available WinOPS data is representative of all otherwise
available data.  This would permit the parties to still contest whether the fact that WinOPS' data is limited
to a single decimal point renders it an inaccurate means of tracking the hours Matteson spent pumping
material.

## IV.  CONCLUSION

For the reasons discussed above, Matteson's Motion for Summary Judgment is denied as to its breach of contract claim, and granted as to Defendant's First Affirmative Defense, Second Affirmative Defense, and Counterclaim.  Sevenson's Cross-Motion for Sanctions is denied.  Matteson's Motion for Status Conference and Suggestions in Support is denied as moot.

## V.  ORDERS

IT HEREBY IS ORDERED, that Plaintiff's Motion for Summary Judgment (Docket No. 30) is GRANTED in part and DENIED in part, in accordance with the Decision above.

FURTHER, that Defendant's Cross-Motion for Sanctions (Docket No. 52) is DENIED.

FURTHER, that Plaintiff's Motion for Status Conference and Suggestions in Support (Docket No. 69) is DENIED as moot.

FURTHER, that this matter is referred back to Judge H. Kenneth Schroeder, Jr. for resolution of Defendant's Motion to Extend Discovery and Amend/Correct Answer to Complaint (Docket No. 21).

SO ORDERED.

Dated:   November 16, 2011
           Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
Chief Judge
United States District Court

23